# EXHIBIT A

IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:** _____

**Filing Date:  July 27, 2011**

**Docket No. 32,340**

**KIM RIVERA,**

    **Plaintiff-Petitioner,**

v.

**AMERICAN GENERAL FINANCIAL SERVICES, INC.,
a/k/a AMERICAN GENERAL FINANCE, INC.,
AMERICAN SECURITY INSURANCE COMPANY,
a/k/a AMERICAN SECURITY GROUP, LINDA
CALLAHAN, and JANE DOE,**

    **Defendants-Respondents.**

**ORIGINAL PROCEEDINGS ON CERTIORARI
William F. Lang, District Judge**

Martinez, Hart & Thompson, P.C.
Bruce Evan Thompson
Albuquerque, NM

Public Justice, P.C.
F. Paul Bland, Jr.
Melanie Hirsch
Washington, DC

Treinen Law Office
Robert Dale Treinen
Albuquerque, NM

for Petitioner

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Charles K. Purcell
Albuquerque, NM

for Respondents

Michael B. Browde
Albuquerque, NM

Law Office of William E. Snead
William E. Snead
Albuquerque, NM

for Amicus Curiae
New Mexico Trial Lawyers Association

Modrall, Sperling, Roehl, Harris & Sisk P.A.
Kenneth L. Harrigan
Albuquerque, NM

for Amici Curiae
American Financial Services Association and Consumer Bankers Association

## OPINION

**DANIELS, Chief Justice.**

**{1}** We granted certiorari in this case to review a Court of Appeals opinion upholding a district court's order compelling arbitration of Petitioner Kim Rivera's claims against a title loan lender, American General Financial Services, Inc., and its affiliated insurance agency, American Security Insurance Company. We base our reversal of those decisions on our holding that the arbitration provisions in the title loan contract cannot be enforced because the involvement of the now-unavailable National Arbitration Forum (NAF) to arbitrate contract disputes was an integral requirement of the parties' agreement. Although no longer technically necessary to our disposition of this appeal, we correct the analysis in the published opinion of the Court of Appeals that imposes an overly narrow construction on New Mexico's unconscionability jurisprudence and misapplies this Court's holding in *Cordova v. World Finance Corp. of N.M.*, 2009-NMSC-021, 146 N.M. 256, 208 P.3d 901.

### I.   BACKGROUND

**{2}** On August 15, 2000, Rivera obtained a car title loan from American General in the amount of $6,517 in cash plus $1,931 in life, disability, and unemployment insurance premiums. As collateral, Rivera gave American General the title to her 1995 truck, which had a value of $15,500 at the time.

**{3}** The form title loan contract used by American General is three pages long. The first

page includes the particularized data about Rivera's loan, including figures for payments, interest, and principal, inserted in preprinted blanks. Preprinted language at the bottom of the page explicitly requires that "ARBITRATION WILL BE CONDUCTED PURSUANT TO THE RULES OF THE [NAF]." Page two includes nine preprinted provisions, including repayment rules, default provisions, and a requirement that the borrower must maintain physical damage insurance on the collateral. Page three, titled "ARBITRATION PROVISIONS," specifies again that "[a]rbitration will be conducted under the rules and procedures of the [NAF] or successor organization" and provides additional arbitration rules and procedures. Page three also details claims covered by and excluded from the arbitration agreement. The binding arbitration agreement encompassed "any and all claims" that Rivera could conceivably have against American General, including,

> without limitation, all claims and disputes arising out of, in connection with, or relating to [Rivera's] loan from Lender today or any previous loan from Lender (including all amendments, modifications and refinancings); any previous retail installment sales contract or loan assigned to Lender; all documents, actions, or omissions relating to this or any previous loan or retail installment sales contract; whether the claim or dispute must be arbitrated; the validity of the Arbitration Provisions, [Rivera's] understanding of them, or any defenses as to the enforceability of the Loan Agreement or the Arbitration Provisions; any negotiations between [Rivera] and lender; any claim or dispute based on the closing, servicing, collection, or enforcement of any transaction covered by the Arbitration Provisions; any claim or dispute based on an allegation of fraud or misrepresentation; any claim or dispute based on or arising under any federal or state statute or rule; any claim or dispute based on a contract or an alleged tort; and any claim for injunctive or equitable relief.

Although the arbitration provisions require Rivera to arbitrate any claims she may have against American General, the arbitration provisions exempt from binding arbitration certain claims that the Lender might have against Rivera:

> [Rivera] cannot elect to arbitrate Lender's self-help or judicial remedies including, without limitation, repossession or foreclosure, with respect to any property that secures any transaction described under the definition of "Covered Claims." In the event of a default under those transactions, Lender can enforce its rights to [Rivera's] property in court or as otherwise provided by law, and [Rivera] cannot require that Lender's actions be arbitrated.

**{4}** Because Rivera did not provide American General with proof of physical damage insurance, American General obtained from its own affiliate, American Security, twelve months of "creditor-placed insurance" for Rivera's truck and added an additional $2,197 insurance premium to the balance of the loan. The insurance policy covered direct and accidental loss of or damage to the truck. In the case of loss or damage, the insurance

contract stated that American Security would, subject to a deductible, pay the lesser of (1) the cost of repairing or replacing the truck, (2) the unpaid balance of Rivera's loan, or (3) the actual cash value of the truck immediately prior to the loss or damage.

**{5}** According to Rivera's district court complaint, after an accident in 2000 that left her truck unusable, neither American General nor American Security ever adjusted the claim, even though Rivera immediately made a claim for the loss of her truck, personally went to American General's office multiple times, and filled out several claim forms and proof-of-loss forms.

**{6}** Rivera alleged that American General continued to send her monthly billing statements and that she continued to submit payments. When Rivera finally defaulted on the loan, American General notified credit reporting bureaus of her delinquency and hired a law firm to recover the remaining debt from her. Although Rivera never repaid the loan in full, in August 2004, nearly four years after her truck was destroyed, American General mailed the truck title back to Rivera in an unmarked envelope without any cover letter or explanation.

**{7}** In September 2006, Rivera filed suit against Defendants American General and American Security in the Second Judicial District Court, alleging breach of contract, breach of the covenant of good faith and fair dealing, insurance bad faith, breach of fiduciary duty, fraud, constructive fraud, and violations of statutory protections in the Insurance Practices Act, the Unfair Trade Practices Act, and the federal Fair Credit Reporting Act. Defendants removed the case to the United States District Court and filed a motion to compel arbitration. After Rivera voluntarily dismissed her only federal claim, the federal court remanded the case back to state court. In April 2008, the Second Judicial District Court granted Defendants' motions to compel arbitration and stay the judicial proceedings.

**{8}** Rivera appealed the order compelling arbitration to the Court of Appeals, which rejected her contentions that (1) the arbitration clause was substantively unconscionable, (2) the arbitration clause was procedurally unconscionable, (3) American General's promise to arbitrate was illusory, (4) equitable relief was inappropriate because of American General's unclean hands, and (5) American Security, which was neither a party to nor mentioned in the arbitration agreement, had no right as a third-party beneficiary to enforce the arbitration provisions. *Rivera v. Am. Gen. Fin. Servs., Inc.*, 2010-NMCA-046, ¶¶ 1, 6, 10, 16, 19-20, 148 N.M. 784, 242 P.3d 351.

**{9}** Rivera also raised a new issue before the Court of Appeals in a motion for rehearing. After this case had been submitted to the Court of Appeals, the NAF, in response to a lawsuit filed by the Minnesota Attorney General challenging NAF's suspect ties to the consumer loan and debt collection industries, stipulated to a consent judgment in which the NAF agreed not to administer, process or "[i]n any manner participate" in any arbitration of consumer disputes after July 24, 2009. Rivera argued that the NAF's unavailability rendered the arbitration provisions in American General's form title loan contract unenforceable. The

Court of Appeals denied the motion for reconsideration.

{10}   Rivera argues in this Court that the arbitration provisions are unenforceable because (1) arbitration before the NAF was integral to the agreement to arbitrate but is now impossible and (2) the arbitration agreement is unconscionable under *Cordova*, 2009-NMSC-021. In addition to opposing Rivera's arguments on their merits, Defendants make a procedural claim that her petition for writ of certiorari was untimely. We (1) reject Defendants' untimeliness arguments, (2) hold on the merits that the arbitration provisions are unenforceable because of the unavailability of the NAF to perform as contemplated in the parties' agreement, and (3) correct the Court of Appeals' overly narrow construction of our holding in *Cordova*.

## II.    DISCUSSION

### A.    Rivera's Certiorari Petition Was Timely Filed.

{11}   Defendants take the position that we should decline to reach the merits of Rivera's appeal because she arguably was late in filing her petition for writ of certiorari. The time limits for filing a petition for writ of certiorari with this Court are found in Rule 12-502(B) NMRA:

> The petition for writ of certiorari shall be filed with the Supreme Court clerk within thirty (30) days after final action by the Court of Appeals . . . . Final action by the Court of Appeals shall be the filing of its decision . . . unless timely motion for rehearing is filed, in which event, final action shall be the disposition of the last motion for rehearing that was timely filed.

{12}   Under Rule 12-404(A) NMRA, a party must file a motion for rehearing within fifteen days of the appellate court's disposition of a case "unless the time is shortened or enlarged by order." The time period is not jurisdictional because the rule explicitly permits the court to enlarge or shorten the fifteen day period. Rivera filed a motion for rehearing on March 8, 2010, eighteen days after the Court of Appeals issued its February 18, 2010, opinion. Although the Court of Appeals did not enter a separate order addressing the time for filing the motion for rehearing, its written order denying Rivera's motion for rehearing explicitly stated: "Appellant having filed a motion for rehearing *which has been considered by the Court*. IT IS ORDERED that the motion for rehearing is denied." (Emphasis added.)

{13}   In the absence of an indication from the Court of Appeals that the motion for rehearing was rejected as untimely, we look to the order denying rehearing as the "final action by the Court of Appeals" under Rule 12-502(B). We have "consistently followed a policy of construing [procedural] rules liberally, to the end that causes on appeal may be determined on the merits where it can be done without impeding or confusing administration or perpetrating injustice." *Olguin v. State*, 90 N.M. 303, 305, 563 P.2d 97, 99 (1977) (internal quotation marks and citation omitted).

**{14}** The Court of Appeals superintends its own docket and has the discretion to indicate in an order whether a motion for rehearing has been denied on grounds of late filing. The Court of Appeals' order did not state that Rivera's motion had been denied for untimely filing; to the contrary, it explicitly represented that the Court of Appeals had "considered" the motion before denying it. Because Rivera filed her petition for writ of certiorari in this Court within thirty days after the Court of Appeals' final action, as required by Rule 12-502(B), we accept Rivera's petition for writ of certiorari as properly invoking this Court's certiorari jurisdiction and address the merits of this case.

**B.  Arbitration Provisions in a Contract Must, If Possible, Be Enforced According to Their Terms, Subject to Established Principles of Contract Law.**

**{15}** "While the interpretation of an arbitration agreement is generally a matter of state law, the [Federal Arbitration Act] imposes certain rules of fundamental importance." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. ___, ___, 130 S. Ct. 1758, 1773 (2010) (internal quotation marks and citation omitted). The arbitration provisions in the form title loan contract between Rivera and American General state that the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16 (2006), "applies to and governs the Arbitration Provisions." To determine whether the arbitration provisions are enforceable, we therefore must consider not only general principles of New Mexico contract law but also substantive federal caselaw interpreting the FAA.

**{16}** Section 2 of the FAA provides that arbitration provisions in contracts involving interstate commerce are "valid, irrevocable, and enforceable." 9 U.S.C. § 2. The United States Supreme Court has emphasized "the fundamental principle that arbitration is a matter of contract" and that "courts must place arbitration agreements on an equal footing with other contracts . . . and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. ___, ___, 131 S. Ct. 1740, 1745 (2011) (internal quotation marks and citations omitted).

**{17}** Despite the policy favoring enforcement of arbitration agreements, under the FAA an arbitration agreement is not enforceable where "grounds . . . exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Agreements to arbitrate may accordingly "be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. ___, ___, 130 S. Ct. 2772, 2776 (2010) (internal quotation marks and citation omitted). "[S]tate law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Perry v. Thomas*, 482 U.S. 483, 492-93 n.9 (1987). But states cannot invalidate arbitration agreements through the application of "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility*, 563 U.S. at ___, 131 S. Ct. at 1746. State law is preempted "to the extent that it actually conflicts with federal law—that is, to the extent that it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Volt Info. Scis., Inc. v. Bd. of Trs. of*

*Leland Stanford Junior Univ.*, 489 U.S. 468, 477 (1989) (internal quotation marks and citation omitted).

{18}   With this interplay of federal and state law in mind, our evaluation of the meaningful enforceability of the arbitration provisions turns on consideration of generally applicable principles of New Mexico contract law.

### C.   The Arbitration Provisions in This Case Could Not Be Enforced As Written Because Involvement of the NAF Was Integral to the Contract.

{19}   As a threshold matter, Defendants argue that we should not consider whether the NAF's unavailability renders the arbitration provisions unenforceable because Rivera did not raise this issue until after the Court of Appeals had filed its opinion. In general, "[t]o preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked." Rule 12-216(A) NMRA. But because the NAF became unavailable more than a year after the district court had issued its order compelling arbitration, Rivera was unable to raise this claim before the district court.

{20}   Our published rules specifically recognize that this Court has the discretion to consider legal matters of "general public interest," even if not technically preserved below. Rule 12-216(B)(1). Amici curiae, American Financial Services Association and Consumer Bankers Association, have explained that the NAF's withdrawal from all consumer arbitrations affects millions of arbitration provisions currently in force. Given the prevalence of arbitration provisions designating the NAF, we conclude that the unavailability of the NAF to arbitrate any consumer disputes presents a legal matter of general public interest, and we exercise our discretion to consider this issue, which the parties have had a full and fair opportunity to brief and argue. *See id.*

{21}   On the merits, Defendants concede that the NAF is unavailable to resolve Rivera's claims, but they argue that the arbitration provisions remain enforceable despite the unavailability of the NAF, on the theory that § 5 of the FAA authorizes a court to select a substitute arbitrator.

{22}   Under § 5 of the FAA,

> [i]f in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire . . . .

9 U.S.C. § 5.

**{23}** Rivera argues that § 5 of the FAA does not apply in cases where the sole designated arbitrator is no longer available, citing *Weiner v. Gutfreund* (*In re Salomon Inc. Shareholders' Derivative Litigation*), 68 F.3d 554 (2nd Cir. 1995). *In re Salomon* addressed an arbitration provision that required all disputes to be resolved by the New York Stock Exchange (NYSE) "and only the NYSE, 'in accordance with the [NYSE] Constitution and Rules.'" *Id.* at 557 (alteration in original). "The NYSE declined to arbitrate the dispute, and the defendants went back to the district court, seeking the appointment of substitute arbitrators under § 5 of the FAA." *Id.* at 555-56. The defendants argued that another arbitration provider could be appointed to arbitrate the dispute using the NYSE's rules. *Id.* at 558. Looking "to the text of the arbitration agreements themselves," *id.*, the Second Circuit Court of Appeals concluded that "the parties had contractually agreed that *only* the NYSE could arbitrate any disputes," *id.* at 559. The court held that a district court cannot "use § 5 [of the FAA] to circumvent the parties' designation of an exclusive arbitral forum" because the unavailability of the parties' named arbitration provider does not constitute "'a lapse in the naming of an arbitrator'" within the meaning of § 5. *Id.* at 560-61. "[T]he lapse referred to in § 5 means a lapse in time in the naming of the arbitrator or in the filling of a vacancy on a panel of arbitrators or some other mechanical breakdown in the arbitrator selection process." *Id.* at 560 (internal quotation marks and citation omitted); *see also Grant v. Magnolia Manor-Greenwood, Inc.*, 678 S.E.2d 435, 438 (S.C. 2009) (perceiving "great merit in the Second Circuit's view that [§ 5 of the FAA] does not apply in cases where a specifically designated arbitrator becomes unavailable").

**{24}** A number of other jurisdictions, including the Eleventh Circuit Court of Appeals, have taken a less rigid approach to the question of whether § 5 of the FAA allows a court to appoint a substitute arbitration provider to replace an unavailable provider. *See Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1222 (11th Cir. 2000). Like *In re Salomon*, *Brown* focused its analysis on the intent of the transacting parties as evidenced by the plain language of the contract. *Brown*, 211 F.3d at 1222. *Brown* recognized that a court cannot appoint a substitute arbitration provider if doing so would be contrary to the transacting parties' intent expressed in the terms of their agreement. If the parties' designation of a particular arbitration provider was integral to the parties' agreement to arbitrate, then § 5 of the FAA cannot be used to circumvent the parties' intent to arbitrate before that specific forum. *Brown*, 211 F.3d at 1222. But if the parties' designation of a provider was merely an "ancillary logistical concern," a court can appoint a substitute under § 5 of the FAA. *Brown*, 211 F.3d at 1222 (internal quotation marks and citation omitted). *Brown* rejected *In re Salomon*'s conclusion that § 5 of the FAA *never* applies in cases where the arbitration provider designated in the contract is unavailable. *Brown*, 211 F.3d at 1222 (explaining that § 5 of the FAA "provides a mechanism for appointment of an arbitrator" unless the NAF was "an integral part of the agreement to arbitrate").

**{25}** Many jurisdictions have likewise declined to apply *In re Salomon*'s bright-line rule and have instead concluded that *Brown*'s "integral" versus "ancillary logistical concern" test

is a proper way to determine whether a court may appoint a substitute arbitration provider. *See, e.g.*, *Ranzy v. Tijerina*, 393 F. App'x 174, 175-76 (5th Cir. 2010) (looking to the plain language of the arbitration agreement to determine whether the parties intended for the NAF to be an integral part of contract); *Reddam v. KPMG LLP*, 457 F.3d 1054, 1061 (9th Cir. 2006) (concluding that the naming of a particular arbitrator was not "so central to the arbitration agreement that the unavailability of that arbitrator brought the agreement to an end"), *abrogated on other grounds as recognized by Atlantic Nat'l Trust LLC v. Mt. Hawley Ins. Co.*, 621 F.3d 931, 940 (9th Cir. 2010); *Carr v. Gateway, Inc.*, 944 N.E.2d 327, 336-37 (Ill. 2011) (holding that § 5 of the FAA could "not be utilized to select a substitute arbitrator" because "the designation of the NAF as the arbitral forum was integral to the parties' agreement to arbitrate"); *Stewart v. GGNSC-Canonsburg, L.P.*, 9 A.3d 215, 221 (Pa. Super. Ct. 2010) (concluding that "the plain language of the arbitration agreement [w]as the sole evidence of the parties' intent" and "delineat[ing] the NAF . . . as the exclusive arbitrators"); *Grant*, 678 S.E.2d at 439 (concluding that the parties' decision to submit to the rules of a particular arbitrator "reflects their specific intent to arbitrate *exclusively* before that body" when that arbitrator "may substantially affect the substantive outcome of the resolution").

{26} We disagree with Rivera's contention that § 5 of the FAA never applies in cases where the designated arbitration provider is no longer available. We agree with the jurisdictions that have focused on the parties' intent, as expressed in the contract, to determine whether § 5 of the FAA permits a court to substitute a different arbitration provider. The "integral" or "ancillary logistical concern" test articulated by the Eleventh Circuit in *Brown*, 211 F.3d at 1222, is consistent with New Mexico's general principles of contract law in requiring courts to "give effect to the intent of the parties." *Continental Potash, Inc. v. Freeport-McMoran, Inc.*, 115 N.M. 690, 704, 858 P.2d 66, 80 (1993); *see Carr*, 944 N.E.2d at 329 (applying Illinois contract law principles to interpret an arbitration agreement); *Stewart*, 9 A.3d at 221-22 (applying Pennsylvania contract law principles to determine whether the designated arbitration provider was integral to the agreement to arbitrate). This approach also best complies with the admonition of the United States Supreme Court that a fundamental purpose of the FAA is to require that courts enforce arbitration agreements "according to their terms." *Volt Info.*, 489 U.S at 479.

{27} We conclude that whether the NAF is integral to the parties' agreement to arbitrate is a matter of contract interpretation. Contract interpretation is a matter of law that we review de novo. *See W. Farm Bureau Ins. Co. v. Carter*, 1999-NMSC-012, ¶ 4, 127 N.M. 186, 979 P.2d 231. "The purpose, meaning and intent of the parties to a contract is to be deduced from the language employed by them; and where such language is not ambiguous, it is conclusive." *Continental Potash*, 115 N.M. at 704, 858 P.2d at 80 (internal quotation marks and citation omitted). If the plain language of a contract evidences the parties' intention to resolve disputes solely through a specific arbitration provider, the parties' intent would be frustrated if a court appointed a different arbitration provider. The determinative issue is whether arbitration before the NAF is integral to the agreement to arbitrate. *See Summit Props., Inc. v. Pub. Serv. Co. of N.M.*, 2005-NMCA-090, ¶ 32, 138 N.M. 208, 118

P.3d 716 (explaining in a non-arbitration context that enforcement of a contract term may be rendered impossible by the occurrence of a supervening event that is contrary to "a basic assumption on which the contract was based").

{28}     Courts have concluded that the identity of the arbitration provider is an ancillary logistical concern in contracts where the arbitration provisions do not specifically designate a provider or where a provision gives transacting parties a choice of providers.  *See, e.g.*, *Jackson v. Payday Loan Store of Ill.*, No. 09 C 4189, 2010 WL 1031590, at *1 (N.D. Ill. Mar. 17, 2010) (concluding that where "the arbitration agreement offers a choice of arbitrators, the selection of a single particular arbitrator cannot logically be so central to the agreement as to merit voiding it"); *Premier Real Estate Holdings, LLC v. Butch*, 24 So. 3d 708, 709-10 (Fla. Dist. Ct. App. 2009) (concluding that the choice of arbitrator was not integral because the contract had an unfilled blank space for designating an arbitrator).  *But see QuickClick Loans, LLC v. Russell*, 943 N.E.2d 166, 174 (Ill. App. Ct. 2011) (holding unenforceable an arbitration agreement that specified arbitration before one of two arbitration providers, both of which were unavailable).

{29}     On the other hand, an arbitration agreement's express designation of a single arbitration provider weighs in favor of a finding that the designated provider is integral to the agreement to arbitrate.  For example, the arbitration provision in *Ranzy* contained terms strikingly similar to the terms in this case:

> [A]ny and all claims . . . *shall* be resolved by binding individual (and not class) arbitration by and under the Code of Procedure of the [NAF] . . . . This agreement to arbitrate all disputes *shall* apply no matter by whom or against whom the claim is filed.  Rules and forms of the NAF may be obtained and all claims *shall* be filed at any NAF office, [or by contacting the NAF via the internet, phone, or mail].

393 F. App'x at 175 (second and third alterations in original).  *Ranzy* concluded that the district court had properly denied the motion to compel arbitration in a substitute forum because "the parties explicitly agreed that the NAF shall be the exclusive forum for arbitrating disputes."  *Id.* at 176; *see also Reddam*, 457 F.3d at 1060 ("[C]ourts . . . have decided that a clause which adopts the rules of an organization like the [NAF] implicitly chooses that organization as the, or a, forum.").  *But see Carr*, 944 N.E.2d at 335 ("[T]he mere fact [that] parties name an arbitral service to handle arbitrations and specify rules to be applied does not, standing alone, make that designation integral to the agreement.").

{30}     The parties' designation of the rules of a specific arbitration provider may indicate that arbitration pursuant to those rules is an integral part of the agreement to arbitrate.  In *Grant*, the South Carolina Supreme Court focused on the significance of the transacting parties' agreement to arbitrate using the rules of the American Health Lawyers Association (AHLA).  678  S.E.2d at 437.  Under AHLA rules, "the parties may not vary the rules on communications, service, counting of days, publication and form of the award, release of

documents, or administration. The parties are bound by a panel of arbitrators selected by the [AHLA]." *Id.* at 439. *Grant* explained that adherence to a specific set of rules can have "wide-ranging substantive implications that may affect," among other things, "the arbitrator-selection process, the law, procedures, and rules that govern the arbitration, the enforcement of the arbitral award, and the cost of the arbitration." *Id.* (internal quotation marks and citation omitted). *Grant* concluded that, where the designation of a particular set of rules "has implications that may substantially affect the substantive outcome of the resolution," the parties' selection of those rules is integral to the agreement to arbitrate. *Id.*

{31}   Mandatory, as opposed to permissive, contractual language further demonstrates that a specifically named arbitration provider is integral to the agreement to arbitrate. *See, e.g.*, NMSA 1978, 12-2A-4(A) (1997) ("'Shall' and 'must' express a duty, obligation, requirement or condition precedent."); *Marbob Energy Corp. v. N.M. Oil Conservation Comm'n*, 2009-NMSC-013, ¶ 22, 146 N.M. 24, 206 P.3d 135 ("'[S]hall' indicates that the provision is mandatory[.]"). *Ranzy* emphasized the portions of the contract that said the parties "'shall' submit all claims to the NAF for arbitration" and that NAF rules "'shall' govern the arbitration." 393 F. App'x at 176. In *Khan v. Dell, Inc.*, No. 09-3703 (JAP), 2010 WL 3283529, at *1 (D.N.J. Aug. 18, 2010), the arbitration agreement provided that "ANY CLAIM, DISPUTE, OR CONTROVERSY . . . SHALL BE RESOLVED EXCLUSIVELY AND FINALLY BY BINDING ARBITRATION ADMINISTERED BY THE [NAF] under its Code of Procedure then in effect[.]" *Khan* found that the mandatory language, "'shall be resolved'" by the NAF, "evince[d] the parties' intent to arbitrate exclusively before a particular arbitrator, not simply an intent to arbitrate generally." *Id.* at *4.

{32}   In this case, American General's form title loan contract names the NAF specifically and exclusively throughout and states that "[a]rbitration will be conducted under the rules and procedures of the [NAF] or successor organization that are in effect at the time arbitration is started and under the rules set forth in the Arbitration Provisions." The "rules set forth in the Arbitration Provisions" state that, in order to initiate arbitration, the borrower must obtain a "Demand for Arbitration" form from the NAF, complete the NAF form, send three copies of the completed form to the NAF, and pay the NAF an initial filing fee. The rules further state that, once arbitration has been initiated, the NAF will provide the parties with a list of seven NAF arbitrators. Each party then strikes three people from the NAF list, and the remaining NAF-designated person serves as arbitrator. Finally, the rules provide complete contact information for the NAF so that the consumer can obtain more information about NAF arbitration procedures.

{33}   In addition to naming the NAF exclusively throughout the arbitration provisions of the agreement, the parties mandated that "[a]rbitration will be conducted under the rules and procedures of the [NAF]." The published NAF *Code of Procedure* exemplified the importance of designating the rules of a particular organization to govern dispute resolution. *See* NAF, *Code of Procedure* (Aug. 1, 2008), http://www.adrforum.com/users/naf/resources/CodeofProcedure2008-print2.pdf.   The

seventy-four page code states that it is "incorporated by reference into every Arbitration Agreement" that refers to the NAF. *Id.* at 1. Among other things, the code governs the manner in which claims can be brought, *id.* at 18-25, the selection and powers of the arbitrator, *id.* at 28-33, the type of hearing afforded to the parties, *id.* at 34-51, the entry of a final binding order by the arbitrator, *id.* at 52-58, and the payment of fees by the parties, *id.* at 59-63.

{34}   Additionally, as in *Ranzy* and *Khan*, the arbitration provisions in this case use mandatory rather than permissive language: (1) "[a]rbitration *will* be conducted under the rules and procedures of" the NAF, (2) to start arbitration "you or Lender *must* . . . complete a Demand for Arbitration (contact NAF for a copy)," (3) the "NAF *will* provide" a list of potential arbitrators, and (4) "NAF rules *shall* determine what portion of the costs you or Lender will pay." (Emphasis added.) The pervasive references to the NAF, selection of the NAF rules, and mandatory language of the contract all support our conclusion that the NAF was integral to the agreement to arbitrate.

{35}   Defendants argue that several features of the contract before us indicate that the NAF was merely an ancillary logistical concern. Because the contract requires arbitration under the NAF "rules and procedures . . . that are in effect at the time arbitration is started," Defendants argue that a court-appointed substitute arbitrator can be ordered to apply the NAF *Code of Procedure* that is currently available online. *See Levy, D.D.S. v. Cain, Watters & Assocs., P.L.L.C.*, No. 2:09-cv-723, 2010 WL 271300, at *6 (S.D. Ohio Jan. 15, 2010) (finding "no apparent reasons why the NAF rules cannot be applied by a substitute arbitrator"). Pursuant to the consent decree, however, the NAF cannot arbitrate any consumer disputes initiated after July 24, 2009, so there cannot be any NAF rules that remain "in effect" for administering consumer disputes. *See Carideo v. Dell, Inc.*, No. C06-1772JLR, 2009 WL 3485933, at *5 (W.D. Wash. Oct. 26, 2009) ("[B]ecause NAF does not arbitrate consumer disputes filed after July 24, 2009, there are simply no NAF rules currently in effect for such arbitrations."). And even if we were to assume that the August 1, 2008, NAF *Code of Procedure* were somehow still in effect, the code itself states that it "shall be administered only by the [NAF] or by any entity or individual providing administrative services by agreement with the [NAF]." NAF *Code of Procedure*, *supra*, at 1. Rivera asserts that there is no "entity or individual providing administrative services by agreement with" the NAF at this time. *See Carr*, 944 N.E.2d at 335 ("[I]t is unclear whether a substitute arbitrator could use NAF rules."). Defendants have not provided this Court with any information to the contrary.

{36}   Defendants also argue that because the arbitration provisions require "[a]rbitration . . . conducted under the rules and procedures of the [NAF] *or successor organization* that are in effect at the time arbitration is started," a "successor" to the NAF can be appointed by a court pursuant to § 5 of the FAA. (Emphasis added.) We doubt that a substitute arbitrator, not selected by the parties but imposed instead by order of a court, could be considered in law a "successor organization" as contemplated by the plain language of the contract. In corporate law, the term "successor" is a legal term of art meaning a "corporation that,

12

Exhibit A
Page 14

through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation." *Black's Law Dictionary* 1569 (9th ed. 2009).

{37} Finally, Defendants point to the severance clause in the contract as support for the proposition that the parties' designation of the NAF was merely an ancillary logistical concern. *See Jones v. GGNSC Pierre LLC*, 684 F. Supp. 2d 1161, 1167-68 (D.S.D. 2010) ("The existence of [a] severance clause in the arbitration agreement is evidence that the parties did not intend for the entire agreement to fail if one portion was invalid or unenforceable."). The boilerplate severance clause in this contract provides simply that "[i]f any term of the Arbitration Provisions is unenforceable, the remaining terms are severable and enforceable to the fullest extent permitted by law." Given the number of references to the NAF as the only named arbitrator and the substantial reliance on the NAF *Code of Procedure* throughout the contract, we could not sever the unenforceable terms of the arbitration provisions without substantially rewriting the contract. Where the NAF involvement in the arbitration provisions is so integral to the agreement itself, for us to change those core provisions would violate our duty to enforce the agreement according to its terms. *See Stewart*, 9 A.3d at 221 (concluding "that the severability clause cannot . . . override the fact that the NAF and the NAF Code were an integral part of the Agreement"); *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 87 (Tex. App. 1996) ("[W]hen the severed portion is integral to the entire contract, a severability clause, standing alone, cannot save the contract.").

{38} The pervasive references to the NAF in the contract compel our conclusion that the parties intended for the NAF to be the exclusive arbitrator in any out-of-court dispute resolution. The parties explicitly specified that arbitration would proceed under NAF rules and procedures. Arbitration "is a matter of consent, not coercion," and the parties "may . . . specify by contract the rules under which that arbitration will be conducted." *Volt Info.*, 489 U.S. at 479. We conclude that "[t]he unavailability of NAF as arbitrator . . . threaten[s] to eviscerate the core of the parties' agreement." *Carideo*, 2009 WL 3485933, at *6. We hold that arbitration before the NAF was integral to the agreement to arbitrate and that § 5 of the FAA does not allow a court to select and impose on the contracting parties a substitute arbitrator inconsistent with the plain terms of their contract.

### D. The Court of Appeals Construed Too Narrowly This Court's Opinion in *Cordova*.

{39} Rivera has argued throughout this litigation that the arbitration provisions are unenforceable under the generally applicable contract defense of unconscionability because the title loan contract requires the borrower to arbitrate any and all claims but allows the lender to go to court for its preferred remedies. Although the district court made its ruling without the benefit of our opinion in *Cordova*, 2009-NMSC-021, holding a similar arbitration provision of a small loan agreement void for unconscionability, *Cordova* had been decided before the Court of Appeals issued its opinion rejecting Rivera's argument. One of the issues on which we granted certiorari was whether the Court of Appeals

13

Exhibit A
Page 15

misapplied our *Cordova* holding by upholding a clause that required a borrower to arbitrate all her claims, but reserved to the lender the right to a judicial determination of its most important claims. Rivera argues in this Court that the Court of Appeals misstated *Cordova*'s holding as requiring "complet[e] one-sidedness" before an arbitration clause can be found unconscionable. Defendants argue that the Court of Appeals was correct and that the arbitration provisions are enforceable under New Mexico law.

**{40}** A threshold issue we must address is whether Rivera's challenge to the Court of Appeals' interpretation of *Cordova* and resolution of the unconscionability issue are now moot in light of our holding that there is no longer an arbitrator eligible to arbitrate either the substance of the dispute or the threshold issue of unconscionability under the terms of the agreement by the parties. While as a prudential matter we normally will not address moot issues that will have no practical impact on the parties before us, we will address issues of substantial public interest or issues that "are capable of repetition yet evading review." *Cobb v. State Canvassing Bd.*, 2006-NMSC-034, ¶ 14, 140 N.M. 77, 140 P.3d 498 (deciding issues of election recount and recheck even though it was no longer possible to affect the election results); *Howell v. Heim*, 118 N.M. 500, 503-04, 882 P.2d 541, 544-45 (1994) (addressing legality of a superseded regulation where similar issues could arise in future cases yet evade appellate review).

**{41}** The issues regarding the Court of Appeals' published interpretation of *Cordova* in the context of one-sided arbitration clauses represent the kinds of issues that are capable of repetition yet likely to evade our appellate review. This is particularly so in light of the inevitable jurisprudential effect of the United States Supreme Court's recent decision in *Rent-A-Center*, which held that where a delegation clause within the arbitration agreement clearly and unmistakably delegates the issue of unconscionability to the arbitrator, that issue should be decided by the arbitrator, instead of by a court, unless the party opposing arbitration has specifically challenged the validity of the delegation clause. 561 U.S. at ___, 130 S. Ct. at 2775-76, 2780-81; *see, e.g.*, *Momot v. Mastro*, ___ F.3d ___, ___, 2011 WL 2464781, at *5 (9th Cir. 2011) (applying *Rent-A-Center* to hold that general language giving the arbitrator authority to determine "the validity or application of any of the provisions of" the arbitration clause was sufficient to take that issue away from a court of law (internal quotation marks and citation omitted)). Given the predictable result that arbitration clauses in form contracts between large corporations and individual consumers will assign such unconscionability determinations to arbitrators, this Court and other courts will have few, if any, future opportunities to participate in the development of our published common law related to unconscionability doctrines in those contexts. Because arbitrators will have to rely on the common law that was developed before *Rent-A-Center*, it is particularly important that we correct a judicial misinterpretation of our caselaw that may otherwise remain on the books as an erroneous precedent. We therefore will address the correctness of the interpretation of *Cordova* contained in the Court of Appeals opinion in this case.

**{42}** Whether a contract provision is unconscionable and unenforceable is a question of law that we review de novo. *See Cordova*, 2009-NMSC-021, ¶ 11. Although we have

already concluded that the arbitration provisions are unenforceable due to the unavailability of the NAF to arbitrate the dispute, we agree with Rivera that the Court of Appeals in this case misapplied the central holding of *Cordova*. We formally reverse the Court of Appeals opinion and hold that the arbitration provisions are unfairly one-sided and substantively unconscionable.

**{43}** "Unconscionability is an equitable doctrine, rooted in public policy, which allows courts to render unenforceable an agreement that is unreasonably favorable to one party while precluding a meaningful choice of the other party." *Id.* ¶ 21. "The doctrine of contractual unconscionability can be analyzed from both procedural and substantive perspectives." *Id.*

**{44}** "Procedural unconscionability . . . examines the particular factual circumstances surrounding the formation of the contract, including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other." *Id.* ¶ 23. When assessing procedural unconscionability, courts should consider whether the contract is one of adhesion. An adhesion contract is a standardized contract offered by a transacting party with superior bargaining strength to a "weaker party on a take-it-or-leave-it basis, without opportunity for bargaining." *Id.* ¶ 33. Adhesion contracts generally warrant heightened judicial scrutiny because the drafting party is in a superior bargaining position. *See Wis. Auto Title Loans, Inc. v. Jones*, 714 N.W.2d 155, 170 (Wis. 2006). Although not all adhesion contracts are unconscionable, an adhesion contract is procedurally unconscionable and unenforceable "when the terms are patently unfair to the weaker party." *Cordova*, 2009-NMSC-021, ¶ 33; *see also Guthmann v. La Vida Llena*, 103 N.M. 506, 509, 709 P.2d 675, 678 (1985), *disapproved of on other grounds by Cordova*, 2009-NMSC-021, ¶ 31.

**{45}** "Substantive unconscionability concerns the legality and fairness of the contract terms themselves," and the "analysis focuses on such issues as whether the contract terms are commercially reasonable and fair, the purpose and effect of the terms, the one-sidedness of the terms, and other similar public policy concerns." *Cordova*, 2009-NMSC-021, ¶ 22. A contract provision is substantively unconscionable if it "is grossly unreasonable and against our public policy under the circumstances." *Id.* ¶¶ 22, 31.

**{46}** "Contract provisions that unreasonably benefit one party over another are substantively unconscionable." *Id.* ¶ 25. For example, where a lender imposes on a borrower a contract that requires the borrower to settle all claims it may have against the lender through arbitration "while reserving for the lender the exclusive option of access to the courts for all remedies the lender is most likely to pursue against the borrower," the contract "is against New Mexico public policy and is therefore void as unconscionable." *Id.* ¶ 1; *see also Padilla v. State Farm Mut. Auto. Ins. Co.*, 2003-NMSC-011, ¶ 10, 133 N.M. 661, 68 P.3d 901 (striking down a facially neutral contract provision because application of the provision benefitted only the insurer, not the insured).

**{47}**     Under New Mexico principles of contract law, a finding of unconscionability may be based on either procedural or substantive unconscionability, or a combination of both. "While there is a greater likelihood of a contract's being invalidated for unconscionability if there is a combination of both procedural and substantive unconscionability, there is no absolute requirement in our law that both must be present to the same degree or that they both be present at all." *Cordova*, 2009-NMSC-021, ¶ 24. "The more substantively oppressive a contract term, the less procedural unconscionability may be required for a court to conclude that the offending term is unenforceable." *Id.*

**{48}**     The arbitration provisions analyzed in *Cordova* "broadly stated that the parties must arbitrate all disputes," *id.* ¶ 3, but also provided that if the borrower defaulted on the loan, the lender could "'seek its remedies in an action at law or in equity, including but not limited to, judicial foreclosure or repossession,'" *id.* ¶ 4. *Cordova* concluded that the arbitration clause was "so unfairly and unreasonably one-sided that it [wa]s substantively unconscionable." *Id.* ¶ 32. This Court determined that the substantive unconscionability of the one-sided contract provisions was "so compelling" that we found it unnecessary to address whether the provisions were also procedurally unconscionable. *Id.*

**{49}**     Other jurisdictions have concurred that unfairly one-sided contract provisions are unconscionable. *See, e.g.*, *Batory v. Sears, Roebuck & Co.*, 456 F. Supp. 2d 1137, 1139-40 (D. Ariz. 2006) (concluding that a one-sided provision was substantively unconscionable under Arizona law); *Iwen v. U.S. West Direct*, 977 P.2d 989, 995-96 (Mont. 1999) (holding a contract provision unconscionable where "the weaker bargaining party ha[d] no choice but to settle all claims . . . through . . . arbitration, whereas the more powerful bargaining party and drafter [of the agreement] ha[d] the unilateral right to settle a dispute . . . in a court of law"); *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 866-67 (Ohio 1998) (refusing to enforce a provision in a consumer loan that allowed the finance company to obtain the judicial remedy of foreclosure but required the borrower to arbitrate all claims); *Taylor v. Butler*, 142 S.W.3d 277, 280 (Tenn. 2004) ("[T]he arbitration clause . . . is unconscionable and therefore void because it reserves the right to a judicial forum for the defendants while requiring the plaintiff to submit all claims to arbitration."); *Arnold v. United Cos. Lending Corp.*, 511 S.E.2d 854, 862 (W. Va. 1998) (holding unconscionable and unenforceable a contract provision that waived the borrower's right to access the courts while preserving the lender's right to obtain relief in a judicial forum); *Wis. Auto Title Loans, Inc.*, 714 N.W.2d at 172-73 (holding that a contract provision that unfairly limited the debtor's remedies, as compared to those available to the creditor, was substantively unconscionable).

**{50}**     In this case the Court of Appeals concluded that American General reasonably excepted judicial foreclosure and repossession from the claims covered by arbitration because (1) "judicial actions for foreclosure and repossession are highly regulated by the statutory provisions governing secured transactions of the Uniform Commercial Code" and (2) "without access to these judicial and extra-judicial procedures, American General would lose many of the statutory protections it enjoyed as a secured creditor." *Rivera*, 2010-NMCA-046, ¶ 13. We disagree.

**{51}** As a matter of law arbitrators have broad authority and are deemed capable of granting any remedy necessary to resolve a case. *See* Thomas E. Carbonneau, *The Law and Practice of Arbitration* 48-49 (3d ed. 2009) (citing, for example, *Rodriguez v. Prudential-Bache Secs., Inc.*, 882 F. Supp. 1202, 1209-10 (D.P.R. 1995)); 4 Am. Jur. 2d *Alternative Dispute Resolution* § 193 (2007) (explaining that "[a]n arbitrator's judgment has the same effect as a judgment of a court of last resort"). The arbitrator's power includes the authority to arbitrate and resolve statutory claims. "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985); *see also Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226-27 (1987) (explaining that the FAA "mandates enforcement of agreements to arbitrate statutory claims" but providing that the "mandate may be overridden by a contrary congressional command" and that the "burden is on the party opposing arbitration . . . to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue").

**{52}** Both the 2008 NAF *Code of Procedure* and the contract in this case reflect the principle that an arbitrator has broad power to resolve claims involving a lender's security interest in collateral. The NAF *Code of Procedure* expressly provides that "[a]ll types of legal and equitable remedies and relief available in court are available in arbitration. . . . Parties may effectively pursue any remedy or relief in arbitration including statutory, common law, injunctive, equitable, and all other lawful remedies and relief." NAF *Code of Procedure*, *supra*, at 10. And the contract at issue in this case specifically states that the "Lender can enforce its rights to [the borrower's] property in court" or "can elect to arbitrate such claims." We conclude that an arbitrator can be given the authority to address any claims a lender may have against a borrower.

**{53}** In its form loan contract, American General unilaterally chose the forum in which it wanted to resolve its disputes, ensuring that it could "enforce its rights to [Rivera's] property in court or as otherwise provided by law" while extinguishing Rivera's right to access the courts for any reason. By excepting foreclosure and repossession from arbitration, American General retained the right to obtain through the judicial system the only remedies it was likely to need. If Rivera's truck had not been destroyed and still had been worth $15,500, American General easily could have recouped the loan principal of $6,517 through repossession. American General's ability under the arbitration clause to seek judicial redress of its likeliest claims while forcing Rivera to arbitrate any claim she may have is unreasonably one-sided. *See Flores v. Transamerica HomeFirst, Inc.*, 93 Cal. App. 4th 846, 854-55 (Cal. Ct. App. 2001) (concluding that a contract provision that forced the borrower to arbitrate all claims but allowed the lender to obtain foreclosure, the only remedy the lender was likely to need, was "so one-sided as to be substantively unconscionable"); *Iwen*, 977 P.2d at 995-96 (explaining that the more powerful bargaining party unfairly reserved the right to go to court and obtain the only remedy it was likely to need).

**{54}** We therefore determine that the arbitration provisions are unfairly one-sided and void

under New Mexico law. As in *Cordova*, the arbitration provisions in this case are so substantively unconscionable that we need not consider whether the provisions are also procedurally unconscionable.

### E. The Arbitration Provisions Must Be Struck in Their Entirety.

{55} When this Court determines that contract provisions are unenforceable we can either "strike the . . . provisions in their entirety" or reform the provisions "into a fair and balanced" agreement. *Cordova*, 2009-NMSC-021, ¶ 39; *see also Padilla*, 2003-NMSC-011, ¶ 15 (explaining that where a contract or contract term is unconscionable, a court can "refuse to enforce the contract," "enforce the remainder of the contract," or "limit the application of any unconscionable term" (internal quotation marks and citation omitted)).

{56} The title loan contract in this case contains numerous provisions that are unenforceable either because they refer to the NAF or because they are unfairly one-sided and substantively unconscionable. Arbitration before the NAF using the NAF *Code of Procedure* was integral to the parties' agreement to arbitrate, and "[t]o appoint a substitute arbitrator would constitute a wholesale revision of the arbitration clause." *Carideo*, 2009 WL 3485933, at *6. Additionally, as in *Cordova* the unconscionable terms are central to the arbitration scheme and cannot be severed without substantially altering the method of dispute resolution contractually agreed on by the parties. *See Cordova*, 2009-NMSC-021, ¶ 40. This Court's "duty is confined to interpretation of the contract which the parties made for themselves." *Continental Potash, Inc.*, 115 N.M. at 704, 858 P.2d at 80 (internal quotation marks and citation omitted). We will not perform "judicial surgery" by rewriting a contract that is laced with unenforceable terms that were "central to the original mechanism[] for resolving disputes between the parties." *Cordova*, 2009-NMSC-021, ¶ 40. We hold that the arbitration provisions must be struck from the contract in their entirety.

### CONCLUSION

{57} The arbitration provisions in the loan contract are unenforceable. We vacate the order compelling arbitration, reverse the district court and the Court of Appeals, and remand to the district court for further proceedings consistent with this Opinion.

{58}    IT IS SO ORDERED.

_____
**CHARLES W. DANIELS, Chief Justice**

**WE CONCUR:**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**


_____
**RICHARD C. BOSSON, Justice**


_____
**EDWARD L. CHÁVEZ, Justice**

**Topic Index for** *Rivera v. American General Financial Services Inc.*, **Docket Number 32,340**

| | |
|---|---|
| **AR** | **ARBITRATION** |
| | |
| **CN** | **CONTRACTS** |
| CN-CO | Contracts Against Public Policy |
| CN-UC | Unconscionable |
| | |
| **RE** | **REMEDIES** |
| RE-AN | Arbitration |